# United States District Court
# Central District of California

| | |
|---|---|
| Brenda DUARTE and Hector SANCHEZ, | Case No. 2:17-cv-08014-ODW-PLA |
| Plaintiffs, | |
| v. | **ORDER GRANTING** |
| QUALITY LOAN SERVICE CORP.; | **DEFENDANT'S MOTION TO** |
| QUALITY LOAN SERVICE | **DISMISS [27]** |
| CORPORATION; QUANTUM | |
| SERVICING CORP.; QUANTUM | |
| SERVICING CORPORATION; and | |
| DOES 1 through 10, Inclusive, | |
| Defendants. | |

## I.    INTRODUCTION

On November 20, 2017, Plaintiffs Hector Sanchez and Brenda Duarte filed a Complaint against Defendants Quality Loan Servicing Corp., Quality Loan Service Corporation (together, "Quality"), and Quantum Servicing Corporation[1] ("Quantum"), alleging violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, and the Civil Rights Act of 1991, 42 U.S.C. § 1981, along with four state law claims.  (*See*

---

[1] Plaintiffs also brought suit against Quantum under the erroneous name "Quantum Servicing Corp." (*See* Mot. 1.)

*generally* Compl., ECF No. 1.)  Plaintiffs later filed a First Amended Complaint, which Quantum now moves to dismiss in its entirety.  (First Am. Compl. ("FAC"), ECF No. 14.; Mot. 2, ECF No. 27.)  For the reasons discussed below, the Court **GRANTS** Defendants' Motion to Dismiss.[2]

## II.    FACTUAL BACKGROUND

In 2005, Plaintiffs applied for a mortgage loan with First Magnus Financial ("First Magnus") in the amount of $412,000.  (FAC ¶ 19, ECF No. 14.)  First Magnus approved the mortgage, and the loan was secured by a deed of trust on Plaintiffs' family home in Long Beach, California (the "Property").  (FAC ¶ 2.)  Plaintiffs later refinanced the Property with American Brokers Conduit ("ABC"), receiving a new loan in the amount of $472,000.  (FAC ¶ 20.)  In 2007, First Magnus and ABC were identified by the Federal Reserve as subprime lenders involved in predatory loans. (FAC ¶ 2.)

In 2010, ABC assigned Plaintiffs' loan to Defendants Quality and Quantum. (FAC ¶ 2.)  The balance on the loan at the time of assignment was $472,200.  (FAC ¶ 21.)  Quality and Quantum acted together as lender and servicer for Plaintiffs' loan. (FAC ¶ 3.)

Plaintiffs are Hispanic, and Defendants knew this to be the case.  (FAC ¶ 7.) Since 2005, Hispanics, as a group, have lost a disproportionate share of their family wealth compared to non-Hispanic whites.  (FAC ¶ 8.)  Plaintiffs themselves lost over 60% of their income between 2005 and 2007.  (FAC ¶ 9.)  From 2008 to 2011, Plaintiffs "slowly began to recover" their income.  (FAC ¶ 9.)

However, Plaintiffs continued to struggle financially throughout this period. (FAC ¶¶ 9–10.)  By 2011, "they had one or more children, and had to account for those expenses."  (FAC ¶ 9.)  Several times between 2010 and 2012, Plaintiffs informed Defendants of their financial struggles, and Plaintiffs made numerous

---

[2] After carefully considering the papers filed in support of the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

requests for a modification of the mortgage loan. (FAC ¶¶ 10, 22, 32.) Defendants denied these loan modification requests, in contravention of best practices suggested by the Office of the Comptroller of the Currency. (FAC ¶¶ 24, 34.) In fact, Defendants rarely, if ever, granted the type of loan modification that would allow severely distressed borrowers to remain in their homes; instead, Defendants "maneuver[ed] homeowners toward default, foreclosure, eviction, and money judgments." (FAC ¶ 25.) As part of their collection efforts, Defendants have filed lawsuits against Latinos in Los Angeles County and Orange County Superior Courts for similar delinquent mortgages. (FAC ¶ 24.)

Plaintiffs do not specify in their First Amended Complaint exactly when Plaintiffs defaulted on their loan. (*See generally* FAC.) In 2012, Defendants moved to foreclose on the loan. (FAC ¶ 22.) In 2011, rates of foreclosure among Hispanic home loan borrowers were higher than rates of foreclosure among non-Hispanic White borrowers. (FAC ¶ 33.) Plaintiffs were ultimately evicted from the Property. (FAC ¶ 57.)

Following foreclosure, Defendants reported Plaintiffs' loan delinquency to the credit reporting agencies. (FAC ¶¶ 22, 26, 39, 49, 56, 71.) The First Amended Complaint is ambiguous as to when or how often Defendants reported Plaintiffs' delinquency. Portions of the Complaint seem to indicate that Defendants reported Plaintiffs' delinquency just once, and thereafter merely failed to subsequently advise the agencies that the underlying loan was predatory. (FAC ¶¶ 26, 39.) Elsewhere, Plaintiffs allege that Defendants made "annual" reports of Plaintiffs' delinquency. (FAC ¶ 71.) Plaintiffs further allege that Defendants "continued" to report Plaintiffs' delinquency until either 2016 or 2017.[3] (FAC ¶¶ 22, 49, 56.)

On November 2, 2017, Plaintiffs filed their initial Complaint in federal court, bringing two causes of action under federal law and four causes of action under

---

[3] For the purpose of this Motion to Dismiss, the Court views the facts in the light most favorable to the Plaintiffs and assumes that Defendants reported Plaintiffs' delinquency annually, through and including the year 2017.

California state law.  (ECF No. 1.)  Plaintiffs subsequently filed a First Amended Complaint on January 15, 2018.  (ECF No. 14.)  On February 26, 2018, Quantum moved to dismiss the First Amended Complaint in its entirety.  (ECF No. 27.)  Quality has yet to appear in this case.  Both Plaintiffs and Quantum have submitted briefs in support of their respective positions, and the Motion is ripe for determination.  (ECF Nos. 27, 30, 33.)

### III.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is proper if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

In ruling on a motion to dismiss under Rule 12(b)(6), the court assumes all factual allegations in the complaint to be true, viewing those allegations in the light most favorable to the nonmoving party.  *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). While a plaintiff need not give "detailed factual allegations," the plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Moreover, a court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Ultimately, "[t]he claim must be sufficiently plausible that 'it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.'"  *Mora v. U.S. Bank*, No. CV 15–02436 DDP (AJWx), 2015 WL 4537218, at *2 (C.D. Cal July 27, 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  If a court determines that a complaint fails to state a claim, the court should grant leave to amend unless it determines that amendment could not possibly

cure the complaint's deficiencies.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998); Fed. R. Civ. P. 15(a)

## IV.    ANALYSIS

For the reasons discussed below, the Court finds that Plaintiffs fail to state a claim for relief.  Plaintiffs' First and Second Causes of Action are time-barred, and Plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action fail on the merits.

**A.    Material outside the Complaint**

Generally, a court "may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011).  However, courts in the Ninth Circuit ruling on 12(b)(6) motions may consider: (1) material that was "properly submitted as part of the complaint," *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555, n.19 (9th Cir. 1989); (2) materials whose authenticity is not questioned and on which the Plaintiff's complaint necessarily relies, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), and (3) judicially noticed matters of public record, *id.* at 688–89.

Both Quantum and Plaintiffs ask the Court to consider certain materials outside the four corners of the Complaint.  (Def.'s Req. Jud. Notice Ex. 1 at 5, ECF No. 27-2; FAC Ex.1, Ex. 2; Decl. of Herbert N. Wiggins ("Wiggins Decl.") Ex. 1, ECF No. 32-1.)  The Court first considers Quantum's requests.

*1.  Quantum's Requests for Judicial Notice*

Quantum asks the Court to judicially notice that the Property was sold at a non-judicial foreclosure sale on February 27, 2012.[4]  (Def.'s Req. Jud. Notice Ex. 1 at 6.) Judicial notice is appropriate when the fact to be noticed "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose

---

[4]  Notably, neither Plaintiffs' Complaint nor their First Amended Complaint specifies when Defendants foreclosed on Plaintiffs' home loan.  The gravamen of the Complaint being that Plaintiffs lost their home as a result of Defendants' collection techniques, the Court would expect to see the date of the sale of the home included as part of a statement whose purpose is to show that Plaintiffs are entitled to relief.  *See* Fed. R. Civ. P. 8(a).

accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b)(2); *see also Lee*, 250 F.3d at 689 (recognizing that a court may take judicial notice of facts in the public record). If a party requests judicial notice of a fact and supplies the Court with the necessary information, the Court must take judicial notice of the fact. Fed. R. Civ. P. 201(c)(2).

The source of the date of the foreclosure sale of the Property is the Trustee's Deed Upon Sale, which is filed at the Los Angeles County Recorder's Office. (Def.'s Req. Jud. Notice Ex. 1.) The Court finds that the accuracy of official records in the County Recorder's Office cannot reasonably be questioned, and therefore finds that the date of the foreclosure sale is beyond reasonable dispute. *See Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 768 (D. Ariz. 2012) (taking judicial notice of a publicly-recorded Trustees' Deed Upon Sale, where defendants provided the court a complete copy and plaintiffs did not object to the request). Moreover, Plaintiffs have not objected to the accuracy of this date. (*See generally* Opp'n, ECF No. 30.) Therefore, the Court takes judicial notice of the fact that the Property was sold at a non-judicial foreclosure sale on February 27, 2012.

Quantum also asks the Court to judicially notice the results of an online search of Los Angeles County Superior Court records for two case numbers that appear in the First Amended Complaint. (*See* Def.'s Req. Jud. Notice Exs. 2, 3; FAC ¶ 12(D).) The Court has no need to rely on the contents of the results of these two searches, and the Court therefore declines to address whether these documents are subject to judicial notice.

### 2. *Plaintiffs' Materials in Support of the Complaint*

Plaintiffs present several materials to the Court in support of their claim for relief. First, Plaintiffs present three studies. Two are attached to the Complaint. (FAC Ex.1, Ex. 2.) The third is attached to a declaration submitted by Plaintiffs' attorney in support of Plaintiffs' Opposition to the Motion to Dismiss. (Wiggins Decl.

Ex. 1.)  Plaintiffs also present a property profile for the Property that is the subject of this dispute.  (Pls.' Req. Jud. Notice Ex. 1, ECF No. 31-1.)

The Court need not rely upon any of these documents in ruling on this motion, because Plaintiffs set forth the statistics that purportedly support their claim in their First Amended Complaint.  (*See* FAC ¶¶ 3, 8, 9, 23, 27, 30, 31.)  Because the Complaint itself contains the relevant data, the Court has no need to go beyond the four corners of the Complaint to consider the studies themselves.  With regards to the property profile, Plaintiffs' Complaint neither relies on nor refers to any of the events or dates listed in the property profile, with the exception of the date of the foreclosure sale itself, which the Court judicially notices.  Therefore, the Court likewise has no need to refer to or make use of any of the dates or events in the property profile.

Because the Court will not rely on any of these documents in ruling on this Motion, the Court declines to address whether these documents are subject to judicial notice.

**B.     Plaintiffs' ECOA Claim Is Time-Barred**

Plaintiffs first allege a series of violations of the Equal Credit Opportunity Act ("ECOA"), relating to Defendants' 2012 foreclosure of Plaintiffs' home loan.  However, an action under the ECOA must be filed within five years of the date of the alleged violation.  15 U.S.C. § 1691e(f).  Plaintiffs filed their complaint on November 2, 2017.  (ECF No. 1.)  Therefore, an action for any violation that occurred before November 2, 2012 is time-barred.

The non-judicial foreclosure sale of the home took place on February 27, 2012. *See supra* Section IV.A.1.  Because the foreclosure sale occurred outside ECOA's period of limitations, any ECOA claim arising from the foreclosure sale itself is time-barred.  For the same reason, any legal claim on an ECOA violation occurring before the foreclosure sale is likewise time-barred.

Thus, the only acts of Defendants that fall within the ECOA's five-year period of limitations are the annual reports of Plaintiffs' default that Defendants made to the

credit bureaus. (FAC ¶ 71.) The Court finds two bases on which to conclude that these annual reports do not violate the provisions of the ECOA.

### 1. Discrimination

The ECOA provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race." 15 U.S.C. § 1691(a)(1). "The ECOA allows for a cause of action for either overtly discriminatory policies or facially neutral policies that have a discriminatory effect." *Mora*, 2015 WL 4537218 at *6; *see also Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1067 (S.D. Cal. 2008) (confirming that disparate impact claims are allowable under the ECOA). Plaintiffs in this case have elected the latter option, alleging and pursuing a disparate impact theory of discrimination. (FAC ¶¶ 27, 35, 37, 46.) To show disparate impact, an ECOA plaintiff "must plead (1) the existence of outwardly neutral practices; (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact." *Hernandez v. Sutter W. Capital*, No. C 09-03658 CRB, 2010 WL 3385046, at *3 (N.D. Cal Aug. 26, 2010). The Court finds that Defendants' actions in the five years preceding Plaintiffs' filing of their Complaint fail to provide the basis for a disparate impact claim on all three counts.

First, in pleading the existence of outwardly neutral practices, a plaintiff must point to a "specific, identified . . . practice or selection criterion." *Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 927 (N.D. Cal. 2008) (quoting *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002)). Thus, a plaintiff alleging disparate impact "generally cannot attack an overall decisionmaking process . . . but must instead identify the particular element or practice within the process that causes an adverse impact." *Stout*, 276 F.3d at 1125. While Plaintiffs do allege that Defendants reported Plaintiffs' delinquency to the credit reporting agencies "as part of

*their collection process*," Plaintiffs fail to allege any facts relating to a specific practice, policy, or selection criterion that Defendants followed in preparing and sending reports to the credit reporting agencies. (FAC ¶ 39 (emphasis in original).)

Moreover, a series of specific, bilateral transactions concerning a lender and a single borrower, without more, cannot provide a basis for disparate-impact liability. Disparate impact liability generally rests on the notion that a *class* of people has been disparately impacted by a defendant's policies, and, as such, a lender must have applied its policy to many individual borrowers both inside and outside the class in order for a plaintiff to be able to conduct a disparate impact analysis in the first place. *See Barrett v. H & R Block, Inc.*, 652 F. Supp. 2d 104, 110 ("[A] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that has created the disparate impact under attack.") (quoting *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989)). Disregarding events falling outside ECOA's period of limitations, Plaintiffs have alleged that Defendants made annual credit reports, but they fail to allege that Defendants made annual reports about anyone *other than Plaintiffs*. (FAC ¶ 71.) Plaintiffs allege no facts or data that show that Defendants maintained a policy and applied that policy to several customers, and therefore, Plaintiffs have not alleged the kind of "specific or particular" policy necessary to conduct a disparate impact analysis. *Wards Cove*, 490 U.S. at 657. In the absence of a clearly defined and broadly applied policy, a disparate impact analysis is quite literally impossible. The Court finds that Defendants' annual reports of Plaintiffs' delinquency are not a "policy" or "practice" for the purpose of Plaintiffs' disparate impact claim.

Likewise, Plaintiffs fail to satisfy the second element of disparate impact liability. The "facially neutral acts" to which Plaintiffs point are Defendants' annual credit reports. *Hernandez*, 2010 WL 3385046, at *3. Plaintiffs' theory of disparate impact puts them in the impossible position of alleging facts that show that Defendants' annual reports of the delinquency of *Plaintiffs in particular* have had a

disproportionate impact on *Latinos in general*.  The absurdity of this position is manifest: a lender's actions toward a single borrower cannot possibly impact an entire race or ethnic group.  Plaintiffs' allegations are limited to how Defendants' reports impacted Plaintiffs, and are devoid of allegations related to how Defendants' reports impacted anyone else.

A successful ECOA plaintiff, by contrast, offers data whose sample set is the class of people who have been *actually subjected* to the defendant's allegedly discriminatory policies.  For example, in *Ramirez*, the plaintiffs presented publicly accessible data showing that "minorities who borrowed from [the defendant lender] between 2004 and 2006 are almost 50% more likely than white borrowers to have received a high-APR loan to purchase or refinance their home."  633 F. Supp. 2d at 928–29.  The court found this data "sufficient to allege a disparate impact . . . on minority borrowers as compared to white borrowers with similar credit risks."  *Id.* at 929.  The *Ramirez* plaintiffs stated a claim on the basis of data about people who had actually done business with the defendant lender.  Plaintiffs here present no such data.

Plaintiffs' case neatly analogizes to a Sixth Circuit case in which a lender denied an Iraqi borrower's request for modification of a commercial loan.  *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).  The borrower alleged disparate-impact discrimination under the ECOA, pointing to the lender's practice of "refinanc[ing] delinquent borrowers who were Caucasian" or "not members of minority groups."  *Id.* at 506 (quotation marks and ellipsis omitted).  The Court found such conclusory allegations insufficient to create an inference of discrimination, noting that the plaintiff's "Iraqi origin does not by itself establish the requisite inference."  *Id.* at 505.  To state a claim, the court explained, the plaintiff would have needed to identify similarly situated individuals whom the creditor treated more favorably.  *See id.* at 506.  The Sixth Circuit further explained:

Where, as here, the complaint alleges facts that are merely consistent with liability (i.e., being Iraqi and being denied a loan extension) as

opposed to facts that demonstrate discriminatory intent (i.e., disparate impact or direct evidence), the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made.

*16630 Southfield*, 727 F.3d at 505.

The Sixth Circuit's reasoning fully applies to this case. Plaintiffs did not identify any similarly situated individuals whom Defendants treated more favorably in their annual credit reporting process. Indeed, Plaintiffs' Complaint suggests that the exact opposite is true, namely, that Defendants utilized aggressive debt collection practices with *all* distressed borrowers, not just Latino borrowers. (*See* FAC ¶¶ 3, 25, 37, 38.)

By alleging disparate impact on the basis of nationwide statistics, Plaintiffs demonstrate a misunderstanding of the nature of a disparate impact claim. (FAC ¶¶ 8, 23, 29, 31, 37.) Plaintiffs present statistics demonstrating disproportionately high rates of post-Great Recession income loss and loan foreclosure among certain minority populations, including Latinos, in an effort to show that Defendants' aggressive debt collection practices have a disparate impact on the ability of Plaintiffs and Latinos to avoid foreclosure. (FAC ¶¶ 11.) For the purpose of a disparate impact claim, however, these statistics are irrelevant. *See Mora*, 2015 WL 4537218, at *7 (examining plaintiff's statistics regarding income disparity between Hispanics and non-Hispanic whites and discerning no "*actual impact* on the relevant group" caused by defendant's policies). All Plaintiffs' statistics show is that the Great Recession had a disparate impact upon certain minority borrowers' ability to fulfill the obligations of their mortgages.

Plaintiffs' disparate impact argument ultimately fails because it was the Great Recession, not Defendants' debt collection practices, that disparately impacted Latinos. By requiring a nexus of causation, the third element of an ECOA disparate impact claim ensures that the cause of the disparate impact is the defendant's policies

and practices themselves, not some outside force. *See Hernandez*, 2010 WL 3385046, at *3. Here, it is outside economic forces, not Defendants' policies, causing the disparity that Plaintiffs allege has impacted them as both individuals and as part of a racial minority group. This being the case, Plaintiffs have also failed to show a causal connection between the accused practice and the disparate impact.

For these reasons, Defendants' annual post-foreclosure credit reports do not provide a basis for disparate impact liability under ECOA.

*2. Scope of ECOA*

Plaintiffs maintain that Defendants' post-foreclosure reporting acts were discriminatory because the underlying, foreclosed loan was discriminatory. (FAC ¶¶ 56, 58.) That a post-transaction report to a third party is discriminatory merely because some aspect of the underlying transaction is discriminatory is a novel legal theory for which Plaintiffs provide no legal precedent or support. (*See generally* Opp'n 12–14.) By advancing this novel legal theory, Plaintiffs ask the Court to first find that Defendants' loan modification denials and foreclosure actions—all of which happened outside the period of limitations—are ECOA violations, and then to impute the discriminatory nature of these violations to Defendants' post-foreclosure reporting acts, some of which are within the period of limitations. (*See, e.g.*, FAC ¶ 58.) The Court declines to adopt this analytical framework and instead takes a simpler approach: Defendants' post-foreclosure reports fall outside the scope of the ECOA in the first place, and therefore, the reports cannot possibly be violations of the ECOA, regardless of any prior discriminatory activity.

The ECOA is violated when a "creditor discriminate[s] against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race . . . ." 15 U.S.C. § 1691(a)(1). Plaintiffs contend that Defendants' reports are part of Defendants' debt collection efforts, and that each report to the credit reporting agencies is therefore an aspect of the mortgage transaction between Plaintiffs and Defendants. (FAC ¶ 34.) The Court disagrees, and finds that Defendants' post-

foreclosure credit reports are not "aspect[s] of a credit transaction" under the ECOA. 15 U.S.C. § 1691(a)(1).

When determining the meaning of a statutory provision, a court looks first "to its language, giving the words used their ordinary meaning." *Artis v. District of Columbia*, 138 S.Ct. 594, 603 (2018). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). Here, the dispute is over the scope of the phrase "aspect of a credit transaction" as used in the ECOA. 15 U.S.C. § 1691(a)(1).

Plaintiffs contend that Defendants' reports to the credit reporting agencies are aspects of the credit transaction between Plaintiffs and Defendants, but the Court concludes that the plain meaning of the term "transaction" excludes such a result. The meaning of this phrase is plain, and is unambiguous in the context of a statute that governs lender-borrower relations. A transaction is "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract." *Transaction*, Black's Law Dictionary (10th ed. 2014). The structure of the word 'transaction' itself yields its plain meaning: a transaction is an action that takes place between two parties. Thus, the term "credit transaction" in § 1691(a)(1) unambiguously refers to a transaction between a lender and a borrower, and not a transaction between a lender and some third party.

The second half of the Black's Law Dictionary definition of 'transaction' provides further instruction. *Id.* If a transaction is the "formation, performance, or discharge of a contract," then a transaction ends when all the legal rights and obligations under the contract have been extinguished. Analogously, a credit transaction ends when all the legal rights and obligations arising from the extension and repayment of credit have been extinguished.

California's power-of-sale anti-deficiency statute provides the last piece of the puzzle. *See* Cal. Civ. Proc. Code § 580d(a); *see also In re Kearns*, 314 B.R. 819, 823

(B.A.P. 9th Cir. 2004) ("[A nonjudicial] foreclosure . . . trigger[s] one of the antideficiency statutes and precludes a subsequent deficiency judgment.") (citing Cal Civ. Proc. Code § 580d). This statute provides that "no deficiency shall be owed or collected, and no deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property . . . in any case in which the real property . . . has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust." Cal. Civ. Proc. Code § 580d(a).

This statute applies to Defendants' foreclosure on Plaintiffs' loan. The non-judicial foreclosure sale on February 27, 2012 was an exercise of the power of sale contained in the deed of trust. (Def.'s Req. Jud. Notice Ex. 1 at 5–6.) Pursuant to California's anti-deficiency statute, Plaintiffs owe no deficiency—and Defendants can collect no deficiency—on the mortgage. In this way, a non-judicial foreclosure in California extinguishes the legal rights and obligations arising from the mortgage transaction and ends the "credit transaction." 15 U.S.C. § 1691(a)(1); Cal. Civ. Proc. Code § 580d(a). Because Defendants' reports to the credit bureaus happened after the foreclosure of the Property, the annual reports are not aspects of the credit transaction, and they therefore do not violate the ECOA.

This result squares with the underlying purpose of the ECOA. The guiding principle of the ECOA is that an applicant's access to credit and favorable credit terms ought to be based on creditworthiness, not on improper factors such as the applicant's race. *See* H.R. Rep. No. 94-210, at 3 (1975) ("[D]iscrimination in credit transactions on the basis of race . . . must be prevented. Numerous instances of denial of credit for reasons other than a person's creditworthiness were brought to the Committee's attention during hearings on the legislation."). Thus, in order to qualify as an "aspect of a credit transaction" and therefore fall within the scope of the ECOA, an accused action must, at minimum, have the potential to affect the borrower's ability to obtain credit and favorable credit terms from the accused lender.

Defendants' annual reports do not pass this test. Nothing about the annual reports makes Defendants' credit any less available to Plaintiffs or to Latinos compared to non-Latinos. The credit transaction ended on February 27, 2012, and the ability of Plaintiffs and Latinos to get credit *from Defendants* remains unchanged by Defendants' annual reports to the credit agencies.

The Court is mindful of Plaintiffs' observation that Defendants' adverse annual credit reports may impede Plaintiffs' ability to obtain credit from *other* lenders. (FAC ¶¶ 41, 49, 76.) This effect, however, is beyond the scope of the ECOA. The Court's survey of the published disparate-impact ECOA cases suggest that only a narrow class of disparate-impact ECOA claims typically survive a motion to dismiss. Such claims are most often based on a lender's discretionary pricing policy, a type of policy where individual lending officers have discretion to alter the terms of the loan as to individual borrowers. *See, e.g.*, *Ramirez*, 633 F. Supp. 2d 922, 929 (finding that a discretionary pricing policy supports a disparate impact claim); *Taylor*, 580 F. Supp. 2d at 1069 (same); *Barrett*, 652 F. Supp. 2d at 110 (same). In each of these cases, the lender's discretionary pricing policy was a specific policy or practice that had a disproportionate impact on the availability of *that lender's* credit to borrowers of certain racial groups. Here, Plaintiffs have not shown that Defendants employ a specific policy, nor have they shown that Defendants' annual reports have negatively affected Plaintiffs' access to Defendants' credit and favorable credit terms. Moreover, Plaintiffs cite no case—and the Court finds no case—recognizing a violation of the ECOA that occurred *after* the debt had been extinguished by foreclosure or otherwise. The Court therefore finds that Defendants' post-foreclosure reports to the credit reporting agencies are not "aspect[s] of a credit transaction" under the ECOA.

*3. Continuing Violation Doctrine*

Plaintiffs also argue that the continuing violation doctrine applies to these yearly reports, such that the entire mortgage transaction becomes one long course of discriminatory conduct that falls within the scope of the ECOA and is therefore not

time-barred. (FAC ¶ 39.) Under the continuing violation doctrine, a violation that falls outside the statutory period of limitations is nevertheless actionable if the violation is part of a continued pattern or practice of violations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982). The Supreme Court in *Havens* explained that when a plaintiff challenges "an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within the statutory limit of the last asserted occurrence of that practice," because the continued nature of the practice keeps the claim from going "stale." *Id.* at 380–81 (alterations omitted).

As the *Havens* court implicitly recognized, application of the continuing violation doctrine in this instance requires that the discriminatory actions falling within the limitations period be actual violations of the ECOA on their own. *See Ramirez*, 633 F. Supp. 2d. at 930 (applying continuing violation doctrine when defendants utilized a discretionary pricing policy during limitations period); *Barrett*, 652 F. Supp. 2d at 111 (same); *City of Los Angeles v. JPMorgan Chase & Co.*, No. 2:14–cv–04168–ODW (RZx), 2014 WL 6453808, at *7 (C.D. Cal. Nov. 14, 2014) (applying continuing violation doctrine to FHA claim when Defendants' practice of offering a disproportionate number of high-risk loans to minority borrowers continued into limitations period). Here, Defendants' yearly credit reports—the only of Defendant's actions that fall within the limitations period—are not violations of the ECOA. *See supra* Sections IV.B.1, IV.B.2. The continuing violation doctrine is inapplicable when, as here, the actions falling within the period of limitations are not themselves violations.

Having concluded that no violation of the ECOA took place within the period of limitations, the Court concludes that Plaintiffs' ECOA claim is time-barred. Because the non-judicial foreclosure sale took place more than five years before Plaintiffs first filed their Complaint, and because all aspects of the credit transaction between Plaintiffs and Defendants ceased at the non-judicial foreclosure sale, any ECOA violation with respect to this mortgage transaction will necessarily fall outside

the period of limitations.  Thus, amendment of the Complaint would be futile. Therefore, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' ECOA claim as to Quantum.  *See Colquitt v. Mfrs. and Traders Tr. Co.*, 144 F. Supp. 3d 1219, 1229 (D. Or. 2015) (dismissing with prejudice portions of Plaintiffs' ECOA claim alleging violations outside the relevant period of limitations).

**C.    Plaintiffs' 42 U.S.C. § 1981 Claim Is Time-Barred**

Plaintiffs' second cause of action alleges a violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981, for racial discrimination in formation and administration of a contract.  (FAC ¶¶ 52–60).  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .
>
> . . . .
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981 (a)–(b).

The period of limitations for a § 1981 violation is at most four years.[5]  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); 28 U.S.C. § 1658.  As with Plaintiffs' ECOA claim, the only actions of Defendants that fall within the period of limitations are the annual reports of Plaintiffs' delinquency made by Defendants to the credit reporting agencies.  The Court employs an analysis that largely parallels its analysis of Plaintiffs' ECOA claim and concludes that Plaintiffs' § 1981 claim is likewise time-barred.

---

[5] For the purpose of dismissal of Plaintiffs' § 1981 claim, the Court assumes that the period of limitations is four years.

### *1. Discrimination*

Plaintiffs allege that Defendants made annual reports "of a foreclosed predatory loan, where said loan was in fact illegal." (FAC ¶ 71.) They argue that the annual reports were a "racially predatory loan practice[]" undertaken "knowingly . . . to injure a Hispanic couple." (FAC ¶ 56.) These allegations, taken as true, show that Defendants showed no mercy on Plaintiffs following default. What they do not show is that Defendants engaged in racial discrimination.

Disparate impact claims are not cognizable under 42 U.S.C. § 1981, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982), so Plaintiffs need to allege actual discriminatory treatment to have success on this claim. The closest Plaintiffs come to alleging discriminatory treatment is in asserting that Defendants filed lawsuits in Los Angeles County and Orange County against Latinos for delinquent predatory mortgages. (FAC ¶ 24.) However, as this Court explained in *Mora*—a case prosecuted by the same attorney representing Plaintiffs in this case— "[i]t is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened because the person is a member of that racial group." *Mora*, 2015 WL 4537218, at *8 (citing *Williams v. Calderoni*, No. 11 CIV. 3020 CM, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). Disparate treatment claims rest on the allegation that a defendant treated two similarly situated individuals differently, treating one less favorably than the other merely because the former is part of a protected class. *See Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1162 (W.D. Wash. 2016) (recognizing that a § 1981 plaintiff can plead discriminatory intent by "alleg[ing] that a similarly situated individual . . . outside of the plaintiff's protected group received more favorable treatment from defendant"). Here, Plaintiffs have alleged nothing to indicate that Defendants, in their annual credit reporting process, treated Plaintiffs any less favorably than they treated non-Latino borrowers who had also defaulted.

Plaintiffs have failed to allege actual discriminatory treatment, and thus have failed to state a claim for relief under § 1981.

### 2. *Scope of 42 U.S.C. § 1981*

Plaintiffs seek to use the same novel theory they used in their ECOA claim to characterize the annual credit reports as discriminatory violations of 42 U.S.C. § 1981. (FAC ¶ 58.) The Court has already established that Defendants' annual credit reports fall outside the scope of the ECOA. *See supra*, Section IV.B.2. The Court similarly concludes that Defendants' annual reports of Plaintiffs' delinquency to the credit reporting agencies fall outside the scope of 42 U.S.C. § 1981.

Plaintiffs allege that the annual credit reports were part of Defendants' collection efforts, in an apparent effort to characterize the annual reports as part of the "enforcement of the contract" under § 1981. (FAC ¶ 58.) The Court declines to read § 1981 so broadly. As discussed *supra*, Section IV.B.2., California has an anti-deficiency statute that extinguishes a borrower's debt obligations upon non-judicial foreclosure sale of the property held in trust. Cal. Civ. Proc. Code § 580d(a). Plaintiffs' loan contract was terminated on February 27, 2012, and at that point their contractual relationship with Defendants ceased to exist. (Def.'s Req. Jud. Notice Ex. 1 at 6.) When, as here, a contractual relationship between lender and borrower has ended, a lender's report of a borrower's delinquency to an entity not party to the loan contract cannot be considered an act that "enforce[s] the contract," thereby giving rise to § 1981 liability. Just as Defendants' annual reports were not an "aspect of a credit transaction" under the ECOA, neither are they part of the "making and enforcing of contracts" under § 1981.

The Court finds no violation of 42 U.S.C. § 1981 to have occurred within the relevant period of limitations. The contractual relationship between Plaintiffs and Defendants ended on February 27, 2012, thus putting an end to the "making" and the "enforcing" of that contract. Because this happened more than four years before the filing of the Complaint, the period of limitations has run. Consequently, because

§ 1981 liability ended more than four years before Plaintiffs filed their Complaint, no events within the period of limitations could possibly be § 1981 violations, making amendment of this claim futile. The Court **DISMISSES WITH PREJUDICE** Plaintiffs' claim under 42 U.S.C. § 1981 as to Quantum.

**D.    Plaintiffs' claim for violation of California's law fails on the merits.**

Plaintiffs bring their third cause of action under California's unfair competition law ("UCL"), Business and Professions Code section 17200 *et seq.* (FAC ¶¶ 61–67.) The Court first notes that Plaintiffs' UCL claim is entirely derivative of their federal claims, which the Court finds insufficient as a matter of law. As a result, Plaintiffs' UCL claim similarly fails. *See Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012) (dismissing plaintiff's UCL claims for unlawful and unfair business practices when those claims were derivative of other causes of actions dismissed by the Court).

The Court also finds that Plaintiffs fail to state a standalone, non-derivative claim for violation of the UCL. To state a claim under the UCL, a plaintiff must allege that a defendant engaged in an "unlawful, unfair, or fraudulent business act or practice" which caused the plaintiff to suffer injury in fact and loss of money or property. Cal. Bus. & Prof. Code § 17204; *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 351 (1993). The statute is written in the disjunctive, meaning that a violation can be based on "any or all of the three prongs of the UCL— unlawful, unfair, or fraudulent." *Aliya Medcare Fin., LLC v. Nickell*, 156 F. Supp. 3d 1105, 1138 (C.D. Cal. 2015) (quoting *Stearns v. Select Comport Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010)). Plaintiffs fail to state a claim under all three prongs of the California UCL.

First, Plaintiffs have failed to allege that Defendants engaged in any act or practice that was unlawful. "The California Supreme Court has explained that by proscribing any unlawful business practice, Business and Professions Code section 17200 borrows violations of other laws and treats them as unlawful practices that the

unfair competition law makes independently actionable." *Bernardo*, 115 Cal. App. 4th at 352 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)) (citations and internal quotation marks omitted). For the reasons stated above, Plaintiffs have failed to allege that Defendants have violated any law within the applicable period of limitations. As such, Plaintiffs have failed to state a UCL claim for unlawful business practices.

Nor have Plaintiffs alleged facts to show that Defendants' business practices were unfair. Courts have used the unfairness prong of Business and Professions Code section 17200 to enjoin particularly "deceptive or sharp practices." *Bernardo*, 115 Cal. App. 4th at 354 (quoting *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965, 970 (1997). Although California courts have struggled to arrive at a single, unified definition of "unfair" under the UCL, *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1401 (2006), the Court is not free to apply its own "purely subjective notions of fairness," *Cel-Tech*, 973 P.2d at 564. To determine if a business practice is unfair to a consumer, the Court balances "the utility of the defendant's conduct against the gravity of the harm to the alleged victim. . . . ."[6] *Klein*, 59 Cal. App. 4th at 969–970 (quoting *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1104 (1996)); *see also Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 939 (2003) (marking the similarity between an unfairness analysis under the UCL and a nuisance analysis at common law).

An action for relief on the basis of the UCL must be filed "within 4 years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208. Therefore,

---

[6] The *Cel-Tech* court held that this definition of "unfair" was inapplicable to cases of the type before it, in which a business alleged unfair competition against a competitor. However, the *Cel-Tech* court expressly clarified that nothing in its opinion related to actions by consumers such as Plaintiffs in this case. *Cel-Tech*, 20 Cal. 4th at 187 n.12. The balancing test articulated by the *Klein* court retains its relevance in UCL actions brought by consumers. *See also Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003) (confining its discussion the *Cel-Tech* holding to cases involving "unfair competition actions"); *see also Camacho*, 142 Cal. App. 4th at 1401 (recognizing a split among the California circuits with regards to whether the *Cel-Tech* definition of unfair applies to consumer cases involving anticompetitive practices, and holding that it does not).

Defendants' annual credit reports are the only accused actions that fall within the period of limitations. (FAC ¶ 71.) Plaintiffs do not allege that the reports were factually inaccurate; instead, they allege that Defendants failed to inform the reporting agencies that the underlying loan was racially discriminatory and predatory. (FAC ¶ 58.)

Applying the balancing test as articulated by the California courts, the Court concludes that Defendants' credit reporting practices are not the type of "unfair" practice that is actionable under the UCL. Annual credit reporting of the kind alleged by Plaintiffs allows borrowers to credibly assert their creditworthiness, and provides lenders a reliable basis on which to assess creditworthiness. In this way, Defendants' annual credit reporting serves a valuable function for both lenders and borrowers.

Against this benefit, the Court balances the gravity of the harm suffered by Plaintiffs as a result of Defendants' annual reports. *See Klein*, 59 Cal. App. 4th at 969–970. Plaintiffs allege that Defendants' annual reports rendered Plaintiffs unable to obtain credit on favorable credit terms, harming their creditworthiness as business owners and potentially preventing them from earning a living. (FAC ¶ 76.) These allegations are speculative and conclusory. Plaintiffs do not allege any facts showing that they were actually denied credit or favorable credit terms at any point as a result of Defendants' annual reports. Plaintiffs' assertion that Defendants' reports injured Plaintiffs' ability to obtain credit is a "naked assertion[] devoid of further factual enhancement," which the Court need not accept as true. *Ashcroft v. Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Plaintiffs have not plausibly alleged any actual harm against which the Court could balance the benefits of Defendants' annual reporting.

Even if Plaintiffs had adequately pled actual harm to their ability to obtain credit, the fact would remain that Plaintiffs indeed defaulted on their loan. The First Amended Complaint paints Defendants as merciless lenders, but showing a defaulting borrower no mercy is not the same as treating that borrower "unfairly." The Court

finds that the harm in this case is outweighed by the benefit that annual credit reporting provides for both lenders and borrowers. As such, the Court finds that Plaintiffs' First Amended Complaint is devoid of actionable practices that could be characterized as "unfair" under the UCL. *See State Farm*, 45 Cal. App. 4th at 1104 (collecting and surveying cases in which a court found an unfair business practice under the UCL).

Finally, Plaintiffs fail to allege that Defendants engaged in a fraudulent business practice. The test for "fraud" under section 17200 is whether the public is likely to be deceived. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (en banc). As with Plaintiffs' other claims, the UCL's limitations period confines the Court's view to Defendants' annual credit reports. The question is whether the public is likely to be deceived by these reports. The answer is no, because these reports are made to credit bureaus, not to the public. Because the public does not see Defendants' annual reports to the credit bureaus, the reports are highly unlikely to deceive the public. Defendants' reporting practices are not "fraudulent" under the California UCL.

Plaintiffs also seek statutory fines under the UCL on behalf of the State of California. (FAC ¶ 67.) Statutory fines are only recoverable in an action brought by the Attorney General, a district attorney, certain county counsel, or a city attorney. Cal. Bus. & Prof. Code § 17206(c); *see also People of Cal. v. Time Warner, Inc.*, No. CV 08-4446-SVW, 2008 WL 4291435, at *2 (C.D. Cal. Sept. 17, 2008). A member of the public bringing suit under the UCL may pray for injunctive relief and restitution, but not statutory damages. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003). Plaintiffs therefore lack standing to seek statutory fines.

For the above reasons, Plaintiffs have failed to state a claim under all three prongs of California's law against unfair competition. Moreover, the Court finds amendment of Plaintiffs' UCL claim would be futile under all three prongs. The

Court therefore **DISMISSES WITH PREJUDICE** Plaintiffs' Third Cause of Action as to Quantum.

**E.     Plaintiffs' claim for breach of the covenant of good faith and fair dealing fails as a matter of law.**

Plaintiffs' Fourth Cause of Action is based on Defendants' alleged breach of the implied covenant of good faith and fair dealing.  (FAC ¶¶ 68–73.)  The implied covenant exists to "assur[e] compliance with the express terms of the contract," *Racine & Laramie, Ltd. v. Dep't of Parks and Recreation*, 11 Cal. App. 4th 1026, 1032 (1992), and it ensures that "neither party will do anything that will injure the right of the other to receive the benefits of the agreement."  *Agosta v. Astor*, 120 Cal. App. 4th 596, 573 (2004) (alterations omitted).  To state a claim for breach of the covenant in this case, Plaintiffs must plead facts showing that (1) Plaintiffs and Defendants entered into a contract; (2) Plaintiffs fulfilled their obligations under the contract; (3) any conditions precedent to Defendants' performance occurred; (4) Defendants unfairly interfered with Plaintiffs' rights to receive the benefits of the contract, and (5) Plaintiffs were harmed by Defendants' conduct.  *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing CACI No. 325).

Plaintiffs' claim fails as a matter of law under the second of these elements because Plaintiffs' own Complaint shows that they failed to fulfill their obligations under the loan contract.  (FAC ¶¶ 12C, 27, 34, 39, 49, 75.)  Plaintiffs admit that they were financially devastated and repeatedly sought modification of the terms of the loan because they were, at that point, unable to fulfill their obligations under the loan contract.  (FAC ¶ 32.)  Although Plaintiffs allege that they "attempted to perform all of the reasonable requirements of the contract" with Defendants (FAC ¶ 69), this allegation does not suffice, because breach of the implied covenant requires that a plaintiff actually meet their contractual obligations, and not merely attempt to meet

the obligations that are by some measure reasonable. *Rosenfeld*, 732 F. Supp. 2d at 968.

The reasonableness of a contractual obligation is irrelevant in an implied covenant analysis, because the implied covenant can hold parties only to the duties established by the terms of the underlying contract. *Agosta*, 120 Cal. App. 4th at 573 (quoting *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349–50 (2000)).  Plaintiffs plead that the rights included under the contract include "the right not to have inaccurate, incomplete, or misleading information reported by said Defendants to the credit reporting agencies."  (FAC ¶ 71.)  This is a conclusory allegation, unsupported by specific contractual language or a summary of the actual agreement. *See Dooms v. Fed. Home Loan Mtg. Corp.*, No. CV F 11-0352 LJO DLB, 2011 WL 1232989, at *10 (E.D. Cal. Mar. 31, 2011) (dismissing a breach of implied covenant claim when plaintiff had not pled "a specific contractual obligation on which to premise an implied covenant claim").  A valid claim for breach of the implied covenant in this case would require, at minimum, pleading that the contract expressly imposed upon Defendants some duty with respect to post-transaction credit reporting.  Plaintiffs allege nothing about how their contract imposed upon Defendants a duty not to report Plaintiffs' delinquency to the credit bureaus, or to report the delinquency in a particular way.

Far from being a breach of any express or implied contract term, Defendants' sale of the home was a permissible exercise of a power of sale contained in the loan contract.  (FAC ¶ 22.)  Plaintiffs defaulted on their loan in February 2012, satisfying the condition precedent to Defendants' lawful exercise of this power.  (FAC ¶ 22.)  In any case, the Court may dismiss this cause of action without addressing whether Defendants breached the implied covenant in the events leading up to the foreclosure sale, because these events fall outside California's four-year period of limitations for actions based on a written contract.  Cal. Civ. Proc. Code § 337.

Plaintiffs' own allegations provide a complete defense to their own claim for breach of the covenant of good faith and fair dealing. Whatever obligations Defendants had under the contract were extinguished by the foreclosure sale, a lawful consequence of Plaintiffs' failure to fulfill their own contractual obligations. If Defendants had a duty to treat Plaintiffs any differently than they did in their annual reporting to the credit bureaus, that duty sounds somewhere other than in contract.

Amendment of Plaintiffs' implied covenant claim would be futile for two reasons. First, Plaintiffs have pled their own defense by pleading facts showing that they did not fulfill their obligations under the loan contract. Second, the foreclosure sale, a lawful exercise of Defendants' contractual right, extinguished both the contract and any and all covenants implied therefrom. Because this happened more than four years before Plaintiffs filed their original Complaint, Plaintiffs' implied covenant claim is time-barred. The Court therefore **DISMISSES WITH PREJUDICE** Plaintiffs' Fourth Cause of Action.

## F. Injunctive and Declaratory Relief

Finally, Plaintiffs ask the Court for injunctive and declaratory relief. (FAC ¶¶ 74–80.)

### 1. Injunctive Relief

Plaintiffs' claim for injunctive relief is premised on Plaintiffs' four substantive causes of action. (FAC ¶ 74.) Because the Court has dismissed all of Plaintiffs' substantive claims, Plaintiffs have no claim on which to base their prayer for injunctive relief. *See Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1073 (C.D. Cal. 2017) ("[I]njunctive relief is a remedy and not, in itself, a cause of action.") (alterations omitted); *see also Massacre v. Davies*, No. 13-cv-04005 NC, 2014 WL 4076549, at *6 (N.D. Cal. Aug. 18, 2014) (dismissing plaintiff's claim for injunctive relief after dismissing all of Plaintiff's other claims). Because the Court has dismissed all the underlying claims with prejudice, the Court likewise **DISMISSES WITH PREJUDICE** Plaintiffs' injunctive relief claim as to Quantum.

### 2. Declaratory Relief

The same reasoning applies to Plaintiffs' claim for declaratory relief. Declaratory relief is not an independent cause of action, but is instead a form of equitable relief. *Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1219 (S.D. Cal. 2012) (citing *Batt v. City & Cnty. Of San Francisco*, 155 Cal. App. 4th 65, 82 (2007). "Equitable remedies are dependent upon a substantive basis for liability and have no separate viability if the underlying claims fail." *Chan v. Chancelor*, No. 09cv1839 AJB (CAB), 2011 WL 5914263, at *6 (C.D. Cal. Nov. 28, 2011); *see Kimball*, 881 F. Supp. 2d at 1220 (dismissing a claim for declaratory relief when all other causes of action failed to state a claim). Here, Plaintiffs' underlying claims have all failed, stripping Plaintiffs' claim for declaratory relief of its viability.

All of Plaintiffs' underlying claims have been dismissed with prejudice, and accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' Sixth Cause of Action for declaratory relief as to Quantum.

### G. Remaining Defendant(s)

Quantum moves for dismissal of the First Amended Complaint in its entirety. (Mot. 2.) The Court has dismissed with prejudice all of Plaintiffs' claims with respect to Quantum, but not with respect to Quality.[7] Quality has been served with notice of this suit, but has not appeared. (ECF No. 35.) For the following reasons, and on its own initiative, the Court dismisses all of Plaintiffs' claims as to Quality.

A trial court may, on its own initiative, note the inadequacy of a complaint and dismiss it for failure to state a claim. *Wong v. Bell*, 642 F.2d 359, 361–62 (9th Cir. 1981) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1357, at 593 (1969)). Sua sponte dismissal on statute-of-limitations grounds is permissible when

---

[7] In addition to suing "Quality Loan Servicing Corp.," Plaintiffs also sued "Quality Loan Servicing Corporation," but Plaintiffs do not appear to have served the latter entity with notice of the suit. It appears that Plaintiffs are treating both "Quality" entities as the same entity, because the party on whom Plaintiffs have been serving notice throughout the progress of this suit is "Quality Loan Servicing Corp." (*See* ECF Nos. 8, 24, 35.)

the facts supporting a statute of limitations defense are set forth in the papers the plaintiff submitted. *Donell v. Kleppers*, No. 10-CV-2613, 2011 WL 6098025, at *4 (S.D. Cal. Dec. 6, 2011). Such dismissal is inappropriate, however, where the defendant has waived the statute of limitations defense. *Begley v. Cty. of Kauai*, No. CIVIL 16-00350 LEK-KJM, 2018 WL 443437, at *3 n.2 (D. Haw. Jan. 16, 2018) (citing *Levald v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993)). Before dismissing sua sponte, the Court must give the plaintiff an opportunity to be heard, unless that plaintiff "cannot possibly win relief." *Dufour v. Allen*, No. 14-cv-05616-CAS(SSx), 2017 WL 373441, at *3 (C.D. Cal. Jan. 23, 2017) (citing *Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988)).

Quality has not filed an answer, nor has default been entered against it. Therefore, Quality has not waived any defenses, including defenses based on a statute of limitations. *See Begley*, 2018 WL 443437, at *3 n.2 (reasoning that a defendant had not waived the statute of limitations defense because the defendant had not yet filed a responsive pleading). The remaining issue is whether Plaintiffs have been adequately heard such that dismissal of their claims as to Quality is not improper.

Ninth Circuit precedent makes clear that a court should not dismiss a claim sua sponte unless the claimant has had an opportunity to be heard. *See, e.g.*, *Wong*, 642 F.2d at 362. Here, Plaintiffs have had adequate opportunity to be heard with respect to both defendants. Plaintiffs make no distinction between Quality and Quantum; indeed, the First Amended Complaint attempts to obliterate the difference between the two entities. Plaintiffs allege that "Quality and Quantum[] acted together, and had a paid contractual relationship." (FAC ¶ 3.) According to Plaintiffs, Quantum acted as lender and Quality acted as loan servicer, or, in the alternative, Quality acted as lender and Quantum acted as loan servicer. (FAC ¶ 3.) Other portions of the Complaint reassert similar dual alternative allegations (FAC ¶ 33, 48), and the First Amended Complaint in general reflects a lack of differentiation between the two Defendants. (*See* FAC ¶ 14 (characterizing Quantum as a "mortgage lender and/or servicer); FAC

¶¶ 21, 22, 24–28, 32–34 (referring to Quality and Quantum collectively as "defendants" and making no distinction between the actions of the two).)  Moreover, Plaintiffs, in their prayer for relief, appear to demand from both Defendants all forms of relief, making no attempt to specify which forms of relief they seek from each Defendant.  (FAC ¶¶ 29–30.)

The First Amended Complaint treats Quality and Quantum interchangeably, and Plaintiffs have had an opportunity to argue that the Court should not dismiss their claims as to Quantum.  Because the First Amended Complaint treats Quality and Quantum interchangeably, the very same arguments that support dismissal as to Quantum support dismissal as to Quality, and Plaintiffs' oppositions to these arguments fail as to Quality for the same reasons they fail as to Quantum.  Thus, the Court concludes that Plaintiffs have had an opportunity to be heard, and the Court **DISMISSES WITH PREJUDICE** all six Causes of Action with respect to Quality, on the same grounds for dismissal as to Quantum.  *Accord Cato v. Cmty. Job Program*, No. C-11-05156 DMR, 2012 WL 2238002, at *2 (dismissing, sua sponte and with prejudice, all of plaintiff's claims as time-barred, before either defendant had appeared).

///
///
///
///
///
///
///

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss. (ECF No. 27.)  The Court **DISMISSES WITH PREJUDICE** Plaintiffs' Complaint in

its entirety as to all Defendants. A judgment will issue, after which the Clerk is directed to close the case.

**IT IS SO ORDERED.**

May 7, 2018

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**